```
               UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
```

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>GEORGE RUIZ,<br><br>      Defendant. | No. 21-po-01490-DLC |

**MEMORANDUM AND ORDER ON MOTION TO SUPPRESS, MOTION TO DISMISS (DKT. NO. 16)**

CABELL, U.S.M.J.

## I. Introduction

The United States has charged the defendant, George Ruiz ("Ruiz"), with three violations arising from a traffic stop and arrest on July 8, 2021. [Dkt. No. 2]. Violation Numbers 9106065, 9106066, and 9106067 respectively charge Ruiz with failure to comply with a traffic control device (36 C.F.R. § 4.12), operating under the influence of alcohol ("OUI") (36 C.F.R. § 4.23(a)(2)), and operating a motor vehicle with a revoked license (36 C.F.R. § 4.2(b); Mass. Gen. Laws c. 90, § 23). [Dkt. No. 2]. On July 13, 2022, Ruiz filed a motion seeking both to dismiss the failure-to-comply violation and to suppress evidence. [Dkt. No. 16]. The court held a hearing on the motion on October 18, at which time it denied the portion of the motion seeking to dismiss. [Dkt. No.

32]. For the following reasons, the court now denies the remainder of the motion seeking to suppress evidence.

## II. Background

The following facts are taken from the arrest report attached to Ruiz's motion (Dkt. No. 16-1). For the purposes of this motion, the facts are not in dispute unless otherwise noted.

On July 8, 2021, at approximately 10:20 PM, United States Park Ranger Matthew Carozzi ("Carozzi") was on patrol in a marked vehicle in the Boston National Historical Park ("BNHP" or "the park"), located in the Boston neighborhood of Charlestown. Carozzi observed a gray Honda Accord drive through the intersection of 1st Avenue and 5th Street "without any headlights on and failing to stop at the posted stop sign." The parties disagree as to whether this intersection is located within the park's boundaries. Carozzi turned on his emergency lights and stopped the Accord. The Accord stopped near the intersection of Vine Street and Chelsea Street, outside the park's boundaries.

Carozzi approached the Accord from the passenger side. The vehicle's only occupant was the driver, later identified as Ruiz. Carozzi immediately noticed that Ruiz's eyes were red and glassy and that his speech was slurred.[1] Carozzi asked Ruiz for his driver's license. Ruiz told Carozzi that he did not have his

---

[1] Ruiz asserts that the footage of the encounter from Carozzi's body-worn camera reveals that his eyes were not red. [Dkt. No. 23, p. 5].

2

license on him but confirmed that he had a valid license. When Carozzi then asked Ruiz for his name and date of birth, he provided a name and date of birth that Carozzi later discovered belonged to Ruiz's brother. Carozzi further asked Ruiz where he had been that evening and if he had had anything to drink. Ruiz stated that he was coming from 7-11, where he had gone to get a sandwich, and that he had consumed "about three drinks," describing them as "a couple beers and a shot." Ruiz said that he consumed those drinks approximately six hours before the stop.

When asked, Ruiz consented to a search of his person for weapons and drugs. He was unsteady on his feet while exiting his vehicle and leaned on the driver's side door for balance. Carozzi's search did not reveal any weapons or drugs, but it did turn up several small, unopened alcohol bottles in Ruiz's jacket pocket. After the search, Ruiz performed three standardized field sobriety tests. Throughout the tests, Ruiz continued to have difficulty keeping his balance, and he appeared to have trouble understanding and following some of Carozzi's directions. During the tests, Ruiz twice remarked that he was "tipsy." At some point, a Boston Police Officer arrived on foot and observed the tests.

After the field sobriety tests, Carozzi arrested Ruiz and transported him to the Massachusetts State Police Barracks in Medford. A trooper at the barracks administered a breathalyzer

test to Ruiz, the results of which showed that his blood alcohol content was .22 percent.

### III. Discussion

Ruiz moves to suppress evidence from the encounter on two different grounds. His first argument is that Carozzi impermissibly extended the traffic stop beyond what was necessary to issue a citation for the alleged motor vehicle infractions, thus violating the defendant's Fourth Amendment rights. His second is that Carozzi exceeded his statutory authority in arresting the defendant outside of the park, likewise in violation of the Fourth Amendment. The court takes these contentions up separately.

#### A. Extension of the Traffic Stop

Roadside traffic stops are analogous to *Terry* stops. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted); *Berkemer v. McCarty*, 468 U.S. 420, 139 (1984). As such, a police officer who conducts a traffic stop "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion involved. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (reasonableness determination is based on the "totality of the circumstances" in light of officer's training and experience). Such a stop "is reasonable where the police have probable cause to

believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996) (citations omitted).

A stop predicated on a traffic violation may normally only last as long as is necessary to address the traffic violation and any related safety concerns. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). There are, however, some important caveats to this limitation. One is that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *see United States v. Chhien*, 266 F.3d 1, 9 (1st Cir. 2001) ("Routine questioning . . ., even when not directly related to the violations that induced the stop in the first place, is not uncommon during a highway stop."). Another is that an officer conducting a traffic stop "may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the investigation." *Chhien*, 266 F.3d at 6.

Here, Carozzi observed Ruiz drive through an intersection on a dark night without his headlights on and without stopping at a stop sign. This gave Carozzi more than probable cause to believe that Ruiz committed a traffic violation, meaning that the initial traffic stop was reasonable. *See Whren*, 517 U.S. at 810. During

5

the stop, and after checking the biographical information Ruiz had provided, Carozzi asked Ruiz about where he was earlier and what he had to drink. Although not directly related to the alleged traffic violations, these inquiries fall into the category of routine questioning, *see Chhien*, 266 F.3d at 9, and there is no indication that they measurably extended the stop. *See Johnson*, 555 U.S. at 333. As such, Carozzi did not unlawfully extend the stop by asking the defendant these questions.

While Carozzi initially stopped Ruiz based on the alleged traffic violations, at some point the stop developed into an OUI investigation. This shift was permissible based on what Carozzi learned during the stop. *See Chhien*, 266 F.3d at 6. By the time that Carozzi asked Ruiz for permission to conduct a search, he could point to multiple specific and articulable facts justifying continued detention to investigate a potential OUI offense. First, Ruiz's eyes were red and glassy, and his speech was slurred.[2] *See Birchfield v. North Dakota*, 579 U.S. 438, 444 (2016) (describing slurred speech as an "outward sign[] of intoxication"); *United States v. Ryan*, 729 F. Supp. 2d 479, 486 (D. Mass. 2010) (finding extension of stop for OUI investigation was reasonable based in

---

[2] Even if Ruiz's eyes were not red, as he claims, his slurred speech, combined with the other factors identified below, provided an ample basis for extending the stop. Likewise, the fact that the slurred speech could have been due to something other than intoxication does not render the speech insufficient for establishing reasonable suspicion. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) (reasonable suspicion is something less than preponderance of the evidence or probable cause).

6

part on defendant's "glassy eyes" and "slurred speech"). Second, the fact that Ruiz was driving late at night without his headlights on is itself a potential indicator of intoxication. *See United States v. Cronin*, No. 10-po-02214-MBB, 2012 WL 4888421, at *6 (D. Mass. Oct. 12, 2012) (evidence justifying park ranger's suspicion of OUI included defendant operating vehicle with headlights off). Third, in response to Carozzi's questions, Ruiz admitted that he had consumed "a couple beers and a shot." [Dkt. No. 16-1]. Taken together, these indications were more than sufficient to provide Carozzi with reasonable suspicion that Ruiz was operating a motor vehicle while under the influence, thus justifying the extension of the stop.

### B. Extra-Statutory Arrest

Ruiz argues that, because Carozzi lacked the statutory authority to arrest him outside the park, the arrest violated his Fourth Amendment rights, and therefore all evidence collected subsequent to his arrest (i.e., the breathalyzer results) must be suppressed. In the alternative, Ruiz argues that the court should exercise its supervisory power and suppress the evidence to disincentivize park rangers from making arrests beyond the park's boundaries in the future. Neither of these arguments is availing, as described below.

1.  *Fourth Amendment Analysis*

The powers of law enforcement personnel within the National Parks System, including the park rangers assigned to the BNHP, are described in 54 U.S.C. § 102701(a)(2). Rangers may "conduct investigations of offenses against the United States committed in the [National Parks] System" without any apparent geographic limitations. 54 U.S.C. § 102701(a)(2)(D). By contrast, rangers may only make warrantless arrests "provided the arrests occur within the System or the individual to be arrested is fleeing from the System to avoid arrest." 54 U.S.C. § 102701(a)(2)(B). The parties agree that Carozzi arrested Ruiz outside of the BNHP and that Ruiz was not fleeing the park to avoid arrest, meaning that Carozzi lacked statutory authority to effect the arrest. The relevant inquiry, then, is whether the extra-statutory arrest violated Ruiz's Fourth Amendment rights.

Both parties recognize that the First Circuit has already weighed in on this issue in *United States v. Ryan*, 731 F.3d 66 (1st Cir. 2013). In *Ryan*, a park ranger observed Ryan, the defendant, cross over the center line of the road while driving within the BNHP. 731 F.3d at 67. By the time the ranger turned on his lights and stopped Ryan, both had left the park and were no longer on federal land. *Id.* Ryan appeared visibly intoxicated during the stop and admitted to the ranger that he had consumed four or five beers. *Id.* After Ryan performed poorly on four field

8

sobriety tests, the ranger arrested him. The government charged Ryan with OUI, unsafe operation of a motor vehicle, and refusal to submit to a breath alcohol test. *Id.* at 68. "Ryan moved to suppress evidence arising from his arrest on the grounds that [the ranger] had no statutory authority to arrest him outside the [p]ark." *Id.* The magistrate judge who presided over the case agreed that the ranger lacked statutory authority to make the arrest but nonetheless found that "the arrest was not an unreasonable seizure within the meaning of the Fourth Amendment." *Id.* After a district judge affirmed the decision, Ryan appealed to the First Circuit. *Id.*

The First Circuit analogized Ryan's case to *Virginia v. Moore*, 553 U.S. 164 (2008). The Supreme Court, in *Moore*, "held that the Fourth Amendment did not prohibit the defendant's arrest or require the exclusion of evidence" even though in that case the police arrested the defendant for driving with a suspended license, which was not an arrestable offense under state law. *Ryan*, 731 F.3d at 68 (citing *Moore*, 553 U.S. at 166-67, 176). The First Circuit found that the differences between Ryan's case and *Moore* – that the seizure violated federal law instead of state law and that the limitation on power to arrest was territorial rather than categorical – were immaterial. *Id.* at 69. As to the territorial restriction on the park ranger's arrest authority, the First Circuit found that "for an officer to arrest an obviously

9

intoxicated driver just outside that officer's territorial jurisdiction, after a lawful traffic stop, is 'not remotely' akin to the invasions of privacy that might call for the exclusion of evidence." *Id.* at 70 (quoting *Whren*, 517 U.S. at 818).

Ruiz contends that his case is distinguishable from *Ryan* because (1) Carozzi knew or should have known that he lacked the authority to make the arrest and (2) there was a Boston Police Officer on scene who could have made the arrest. Neither of these details moves this case outside the scope of *Ryan*'s holding.

Assuming Carozzi knew he could not lawfully arrest Ruiz, nothing in *Ryan* indicates that such knowledge would convert the arrest into an unreasonable invasion of privacy. Ruiz points to the First Circuit's citation to *Pasiewicz v. Lake Cnty. Forest Preserve Dist.*, 270 F.3d 520 (7th Cir. 2001), as evidence to the contrary. *See Ryan*, 731 F.3d at 71. The First Circuit cited *Pasiewicz* as part of a string citation showing that "[o]ther courts of appeals have agreed that an extraterritorial arrest may comply with the Fourth Amendment." *Id.* It went on to describe *Pasiewicz* in a footnote: "In *Pasiewicz*, the court stated that the result might have been different if the arresting officers had known that they lacked jurisdiction and made an arrest in violation of a specific prohibition by the police department in whose jurisdiction they acted." *Id.* at 71 n.5 (citing *Pasiewicz*, 270 F.3d at 527). While this footnote further explained *Pasiewicz*, it

did not indicate that the First Circuit adopted the Seventh Circuit's view about what might change the reasonableness inquiry. Further, the Seventh Circuit mused on a hypothetical scenario in which the arresting officer was specifically prohibited from making the arrest by the local police department. *Pasiewicz*, 270 F.3d at 527.  No such prohibition exists here.[3]  Accordingly, nothing in *Ryan* suggests that Carozzi's purported knowledge of the limits of his arrest authority would make the arrest unreasonable.

Ruiz also argues that the arrest was unreasonable because there was a Boston Police Officer on the scene who could have legally effected the arrest.  As with the knowledge issue, nothing in *Ryan* suggests that the presence of a local police officer makes a difference.  The relevant inquiry is not whether a better means for making the arrest was available at the time.  The inquiry is whether the arrest constituted an unreasonable invasion of privacy in violation of the Fourth Amendment.  Both Supreme Court and First Circuit precedent are clear that an arrest like this one is not remotely unreasonable.  *See Moore*, 553 U.S. at 171 ("[W]hen an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt.  The arrest is constitutionally reasonable."); *Ryan*, 731 F.3d at 70 (quoting *Whren*, 517 U.S. at

---

[3] As noted, a Boston Police Officer was present when Carozzi arrested Ruiz. There is no indication that the officer objected to the arrest.

11

818) (extraterritorial arrest of obviously intoxicated driver "is 'not remotely' akin to the invasions of privacy that might call for the exclusion of evidence."). The possibility that a local police officer could have made the arrest does not so dramatically change the calculus as to render an otherwise clearly reasonable arrest unreasonable.[4] As such, the court finds that the arrest did not violate the defendant's Fourth Amendment rights.[5]

2. *Supervisory Power*

Finally, Ruiz urges the court to use its supervisory power to discourage future extraterritorial arrests by suppressing evidence or even dismissing the case outright. Both the government and Ruiz identify several cases in which park rangers made arrests outside the boundaries of the BNHP. [Dkt. No. 20, pp. 17-18; Dkt. No. 23, pp. 7-8]. According to Ruiz, the sheer number of such cases indicates that park rangers are willfully ignoring the statutory limits of their arrest authority, safe in the notion that *Ryan* will shield them from any consequences. The court does not agree with Ruiz's interpretation, nor does it find that the exercise of its supervisory power would be appropriate here.

---

[4] The Boston Police Officer reportedly approached the scene on foot. [Dkt. No. 20, p. 16]. From a practical standpoint, Carozzi was in a much better position to make the arrest than an officer who showed up midway through the encounter and had no vehicle in which to transport the defendant.

[5] Ruiz also argues, in summary fashion, that *Ryan* is wrongly decided. [Dkt. No. 16, p. 11]. This court is bound by *Ryan*, and in any case finds no basis on which to disagree with the decision.

In exercising their supervisory powers, "federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress." *United States v. Hasting*, 461 U.S. 499, 505 (1983). The threefold purposes of these powers are "to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct." *Id.* (internal citations omitted). "Even so, courts must use these powers sparingly." *United States v. Stokes*, 124 F.3d 39, 46 (1st Cir. 1997) (internal quotation omitted). Use of the supervisory power, even if otherwise "sensible and efficient," may not "conflict[] with constitutional or statutory provisions." *Thomas v. Arn*, 474 U.S. 140, 148 (1985). "To allow otherwise 'would confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing.'" *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988) (quoting *United States v. Payner*, 447 U.S. 727, 737 (1980)).

*United States v. Payner*, 447 U.S. 727 (1980), provides a useful analogue to show why the exercise of supervisory power would be inappropriate here. In *Payner*, the government relied upon evidence illegally seized from one person in the prosecution of another person. 447 U.S. at 729. According to the district court, not only did the government "knowingly and willfully participate[]

13

in the unlawful seizure," but it "affirmatively counsel[ed] its agents that the Fourth Amendment standing limitation permits them to purposefully conduct an unconstitutional search and seizure of one individual in order to obtain evidence against third parties." *Id.* at 730. Because the defendant lacked standing to challenge the seizure under the Fourth Amendment, the district court instead used its supervisory power to suppress the evidence. *Id.* at 730-31. The Supreme Court reversed, finding that the district court could not use its supervisory power to suppress the evidence when suppression would not be proper under the Fourth Amendment. *Id.* at 735. The Court summarized its reasoning as follows:

> The values assigned to the competing interests do not change because a court has elected to analyze the question under the supervisory power instead of the Fourth Amendment. In either case, the need to deter the underlying conduct and the detrimental impact of excluding the evidence remain precisely the same.

*Id.* at 736.

Applying the principles of *Payner* here, in a much less extreme case, the exercise of the court's supervisory power would clearly be unwarranted. As discussed above, the Fourth Amendment does not come close to requiring suppression of the evidence obtained after Ruiz's arrest. Not only would it be imprudent to ignore the Fourth Amendment and suppress the evidence anyway in the name of the supervisory power, it would be error.

## IV. Conclusion

For the foregoing reasons, the defendant's motion to suppress is DENIED.

So Ordered.                              /s/ Donald L. Cabell
                                         DONALD L. CABELL, U.S.M.J.

DATED:  November 25, 2022